UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **LLAMAR VENSON**, | 2:20-CV-11865 |
| Petitioner, | |
| | HON. TERRENCE G. BERG |
| v. | |
| | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| **ROBERT VASHAW**,[1] | |
| Respondent. | |

Llamar Venson is serving a 15-to-30-year sentence at a Michigan correctional facility for his Wayne Circuit Court jury trial conviction of first-degree criminal sexual conduct. Venson has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 raising four claims: (1) the trial court erred in scoring the sentencing guidelines, (2) trial counsel was ineffective for failing to move for a directed verdict, (3) insufficient evidence was presented at trial, and (4) there was a prejudicial twelve-year pre-indictment delay. Because the claims are without merit, the petition will be **DENIED**. The Court will also **DENY** a certificate of appealability and deny permission to appeal in forma pauperis.

---

[1] The Court corrects the caption to name Robert Vashaw as Respondent. *See Edwards v. Johns*, 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *see* also Rule 2(a), 28 foll. U.S.C. § 2254.

# BACKGROUND

The Michigan Court of Appeals summarized the facts surrounding

Venson's conviction as follows:

> This case arises from a sexual assault that occurred on July 4, 2004. The victim, 23-years old at the time, lived with her grandmother, who required her to be home by 11:00 p.m. After spending an evening with her boyfriend, Adrigo Cowans, the victim returned home late and found that her grandmother would not let her in the house. Cowans and the victim drove around until Cowans decided where they would go for the night. They pulled in front of a house and Cowans said that his cousin and his friend would be coming to the house. The victim went inside with Cowans and did not see anyone.

> Cowans and the victim sat on the couch and watched television. After Cowans fell asleep, someone knocked on the door. The victim tried to wake Cowans, but was unable to do so. An elderly woman came out from one of the bedrooms and let in two men, who the victim believed were Cowans's cousin and his friend. According to the victim, one of the men asked the victim if she smoked marijuana. She said yes and asked if it was "already rolled." Both men said no. They asked if she wanted to smoke and she said yes. The victim went to the bathroom and, when she came out, the men were in a bedroom. She asked if they could smoke in the living room near Cowans, but the men said no. After one of the men lit a marijuana blunt and both men smoked it, one of the men brought the blunt to the victim, who was standing in the doorway to the bedroom. After inhaling the marijuana, the victim became light-headed; after inhaling a second time, her legs and feet started to become weak and she started to lose her balance. The man who handed her the blunt caught her and brought her to the couch in the bedroom.

The victim testified that the men kept asking her if she was okay, but her tongue was getting numb and she could not speak or move. One of the men shut the door to the bedroom. They started asking each other about a condom, which neither of them had, and then debated who would go first. One of the men tried to take the victim's dress off from the top, but was unable to do so. The men then lifted up her dress and laid her down, still arguing about who would go first. One of the men pulled her dress up and the other man pulled down her underwear. One of the men then put his penis in her vagina. The victim testified that she was crying. The other man was rubbing the victim's breast area. When the first man stopped, the other man put his penis in the victim's vagina. After the second man finished, the men started to leave, but then one of them turned around and fixed the victim's clothing. The men carried the victim out to the living room and sat her in a chair. She was still unable to communicate, stand, or walk. The men then left out the front door.

Cowans testified that when he woke up, the victim was sitting in a chair in the corner crying. The victim said that she wanted to get out of the house, and Cowans helped her to the car. Cowans asked the victim why she was crying and she said, "[Y]our cousin and his friend raped me." After going back inside and confronting defendant and Williams, who denied the sexual assault, Cowan took the victim to the hospital.

Dr. Chada Reddy testified that she worked at Holy Cross Hospital in Detroit in July 2004 as an emergency room doctor and, based on a review of his chart, confirmed that he saw the victim on July 4, 2004. He further testified that a rape kit was completed, and there would also have been emergency room records, which he did not have; someone had informed him that the records had been destroyed. Reddy testified regarding the information contained in the three pages from the rape kit. Reddy did not know if there were more than three pages to the rape kit, and he did not recall a need to order a toxicology report for the victim.

Ulysha Hall, Deputy Chief of Police for the Detroit Police Department, was on patrol on July 4, 2004. Dispatch sent her and her partner to Holy Cross Hospital, where she spoke with the victim and produced a report. The victim identified her perpetrators as black males and provided their nicknames, which were "T" and "Thug," who also was called "Animal Thug." Hall notified the Sex Crimes Unit about the alleged assault.

The victim's rape kit was one of approximately 11,000 rape kits discovered in storage by the Detroit Police Department in 2009. Kathy Fox, a forensic scientist with the Michigan State Police in the Lansing Crime Lab, testified that a crime lab in Virginia analyzed the rape kit in 2010.[1] Fox explained that analysis revealed spermatozoa on the victim's vaginal swabs and semen on the victim's dress, and that both the vaginal swabs and the dress were submitted for DNA analysis. The DNA profile from the sperm fraction of the vaginal swabs was consistent with the mixture of two foreign individuals, including a major male contributor (male one) and a minor donor. The DNA profile obtained from the sperm fraction of the dress was consistent with a male contributor (male two). In 2011, a search of the "Michigan State Police DNA Index System Database"[2] associated the sperm fraction on the dress with Cowans,[3] and the sperm fraction on the vaginal swabs with defendant.

Detective Janet Sise, assigned to the Wayne County Prosecutor's Sexual Assault Kit Task Force, became the officer-in-charge of the victim's case in 2014. In 2016, defendant and his codefendant, Tyrod Lerenzo Williams, were charged with CSC-I under MCL 750.520b(1)(d)(i) (defendant was aided or abetted by another person and knew that the victim was physically helpless) and third-degree criminal sexual conduct (CSC-III) under MCL 750.520d(1)(c) (victim physically helpless). They were tried jointly before one jury in 2017. The jury acquitted Williams, but convicted defendant of

CSC-I, and, as already indicated, the trial court sentenced him to 15 to 30 years' imprisonment.

---

[1] Fox explained that when the Detroit Police discovered the rape kits, they looked for other crime labs around the country to help process them in a timely manner.

[2] The witness likely was referring to CODIS, the Combined DNA Index System.

[3] Both the victim and Cowans testified that they had had sex in a park on their evening out.

*People v. Venson*, No. 339921, 2019 WL 942310, at *1-3 (Mich. Ct. App. Feb. 26, 2019).

After sentencing, Venson filed a claim of appeal in the Michigan Court of Appeals. His appointed appellate counsel filed an appellate brief that raised one claim:

I. The trial court erred scoring OV4 at 10 points where no psychological injury occurred to the victim and erred scoring OV8 at 15 where there was no victim asportation.

Venson also filed his own pro se supplemental brief that raised an addition four claims:

II. Defendant-Appellant's due process rights were violated when the Detroit Police Department and Wayne County Prosecutor's Office failed to secure potentially exculpatory evidence or bring him to trial within a timely manner.

III. The prosecution failed to prove all elements of the crime as charged beyond a reasonable doubt, as shown by the not guilty verdict of Appellant's co-defendant, Tyrod Williams.

5

IV. Trial court erred in denying Defendant-Appellant's motion to quash the incomplete medical records pertaining to complainant's visit to the emergency room on July 4, 2004.

V. Trial counsel was ineffective for failing to move for a directed verdict of acquittal after co-defendant Tyrod Williams was found not guilty on all charges.

The Michigan Court of Appeals affirmed in an unpublished opinion. *Venson*, 2019 WL 942310. Venson filed an application for leave to appeal in the Michigan Supreme Court that raised the same claims, but it was denied by standard order. *People v. Venson*, 932 N.W.2d 778 (Mich. 2019) (Table).

## STANDARD OF REVIEW

Section 2254(d) of Title 28 of the United States Code, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, places strict limits on federal courts' authority to grant applications for a writ of habeas corpus by state prisoners. *Moore v. Mitchell*, 708 F.3d 760, 781 (6th Cir. 2013). Section 2254(d) instructs that federal courts "shall not" grant a habeas petition filed by a state prisoner with respect to any claim adjudicated on the merits by a state court, absent applicability of either of two specific exceptions. The first exception occurs if the state-court judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The second exception applies if

the state court judgment "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The statute therefore requires a high degree of deference to state-court rulings and demands those decisions be given the benefit of the doubt. *Renico v. Lett*, 559 U.S. 766, 773 (2010). Fundamentally, § 2254(d) casts federal habeas review as a safeguard against "extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (citation omitted).

## DISCUSSION

A. Sentencing Guidelines

Venson first claims that the trial court erred in scoring the sentencing guidelines. He asserts that he was incorrectly assessed points for the offense variables concerning psychological injury to the victim and for moving the victim to a place of greater danger. The Michigan Court of Appeals found that the scoring of the guidelines was sufficiently supported by the record and denied relief. *Venson*, 2019 WL 942310, at *3-4.

In general, "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus," and federal habeas relief is not available for errors of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76

(2005) (per curiam). More specifically, "errors in the application of state sentencing guidelines . . . cannot independently support habeas relief." *Kissner v. Palmer*, 826 F.3d 898, 904 (6th Cir. 2016). Habeas petitioners have "no state-created interest in having the Michigan Sentencing Guidelines applied rigidly" in their sentence determinations. *Mitchell v. Vasbinder*, 644 F. Supp. 2d 846, 867 (E.D. Mich. 2009). A claim that the state trial court incorrectly scored, calculated, or applied the state sentencing guidelines is not a cognizable claim for federal habeas review. *Paris v. Rivard*, 105 F. Supp. 3d 701, 724 (E.D. Mich. 2015) (citing *McPhail v. Renico*, 412 F. Supp. 2d 647, 656 (E.D. Mich. 2006)).

Venson also argues that his sentence was based on material misinformation because the guidelines were scored based on allegations for which there was no evidentiary support. It is true that a sentence may violate due process if it is based upon "material 'misinformation of constitutional magnitude.'" *Koras v. Robinson*, 123 F. App'x 207, 213 (6th Cir. 2005) (quoting *Roberts v. United States*, 445 U.S. 552, 556 (1980)); *see also United States v. Tucker*, 404 U.S. 443, 447 (1972); *Townsend v. Burke*, 334 U.S. 736, 741 (1948). But to prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Koras*, 123 F. App'x at 213 (quoting *United States v. Stevens*, 851 F.2d 140, 143 (6th Cir. 1988)).

Venson fails to demonstrate that the guidelines were scored based on material misinformation. With respect to psychological injury, the scoring reflected "serious psychological injury requiring professional treatment occurred to a victim." MICH. COMP. LAWS § 777.34(1)(a). The victim testified at trial that "this incident hurt more than anything else I been through in my life," and resulted in her "going through a lot of therapy." (ECF No 9-10, PageID.863-65.) (5-Tr. 4/20/2017, at 94.) The victim stated for the presentence investigation report that she "felt like [she] was just a piece of trash," now looks at men differently, and the incident has ruined her relationships. (ECF No. 9-17, PageID.1197-1200, 1222.) The scoring was therefore not based on material misinformation.

With respect to the other contested variable, the scoring reflected that the victim was moved to "another place of greater danger." MICH. COMP. LAWS § 777.38(1)(a). The trial evidence indicated that after being drugged by the perpetrators, one of them brought the victim from the doorway into another room and sat her on a couch. (ECF No. 9-10, PageID.811). This location was further away from the living room where her boyfriend had fallen asleep. (*Id*. at PageID.806-07.) One of the perpetrators then closed the door. (*Id*. at PageID.814.) Thus, the finding of the trial court with respect to this variable was also not based on material misinformation.

Venson therefore fails to establish entitlement to habeas relief based on his first claim.

## B. Sufficiency of the Evidence

Venson asserts that insufficient evidence was presented at trial to sustain his conviction for first-degree criminal sexual conduct performed with the aid or assistance of another person because his co-defendant was acquitted. He relatedly claims that his counsel was ineffective for failing to move for a directed verdict of acquittal after the jury returned a not guilty verdict with respect to his co-defendant.

The Michigan Court of Appeals rejected the claim as follows:

> Defendant also contends that there was insufficient evidence to support his conviction of CSC-I under MCL 750.520b(1)(d) because an essential element of this offense is that the actor be aided or abetted by another person and the jury found defendant's alleged accomplice, Williams, not guilty of the charged offense. Once again, we disagree. This Court reviews de novo a challenge to the sufficiency of the evidence. *People v. Willis*, 322 Mich. App. 579, 583; 914 N.W.2d 384 (2018). In determining whether sufficient evidence to support a conviction was presented at trial, "this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *Id*. Further, "a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury's verdict." *People v. Nowack*, 462 Mich. 392, 400; 614 N.W.2d 78 (2000). "Whether conduct falls within the scope of a criminal statute ... is a question of statutory interpretation that [this Court] review[s] de novo." *Willis*, 322 Mich. App. at 584.

Defendant was charged and convicted under MCL 750.520b(1)(d)(i), which provides:

> (1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:
>
> * * *
>
> (d) The actor is aided or abetted by 1 or more other persons and either of the following circumstances exists:
>
> (i) The actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

"The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v. Henderson*, 306 Mich. App. 1, 10; 854 N.W.2d 234 (2014) (quotation marks and some citations omitted). In order to establish that a person aided or abetted the commission of a crime, prosecution must show

> that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. [*Id.* (quotation marks and citation omitted).]

Defendant contends that there was insufficient evidence to support his conviction because an accomplice is a necessary element of the offense and the jury acquitted his alleged accomplice, Williams, of all charges. Defendant is incorrect. The plain language of the relevant statute does not include any express requirement that the person who aided or abetted the defendant be convicted of any offense. See MCL 750.520b(1)(d). Rather, the statute merely requires that the other person "aided or abetted" the defendant, which means that the other person performed acts or gave encouragement that assisted the commission of the crime and intended the commission of the crime or had knowledge that the principal intended its commission at the time that the person gave aid or encouragement. *Henderson*, 306 Mich. App. at 10.[6]

Despite his acquittal, there was sufficient evidence for the jury to find beyond a reasonable doubt that Williams performed acts or gave encouragement that assisted defendant's commission of CSC-I and that Williams intended the commission of CSC-I, or had knowledge that defendant intended its commission, at the time that Williams gave aid or encouragement. The record shows that both men participated in offering the marijuana to the victim, both repeatedly asked if she were okay, they discussed together whether either had a condom, and they debated who would "go first." The victim testified that one of the men lifted her dress up and the other man pulled down her underwear. The victim's testimony clearly established that Williams performed acts that assisted in the commission of the crime. Williams's intent that CSC-I be committed, or knowledge that defendant intended to commit CSC-I, can be inferred from his actions in assisting in removing the victim's clothing, which occurred after the two men discussed a condom and argued about who would "go first." On this record, there was sufficient evidence that Williams aided or abetted defendant. Defendant does not dispute the elements of sexual penetration and that the victim was physically helpless. Therefore, there was sufficient evidence to support

defendant's conviction of CSC-I under MCL 750.520b(1)(d)(i).

------

[6] This Court has held that in order to support a defendant's conviction under MCL 750.520b(1)(d)(ii ) under an aiding or abetting theory, it was not necessary to "show that a specifically named individual was the guilty principal, but only that some individual was a guilty principal." People v. Vaughn, 186 Mich. App. 376, 382; 465 N.W.2d 365 (1990). That a principal need not be convicted in order to convict an aider and abettor under MCL 750.520b(1)(d) lends support to the conclusion that an aider and abettor need not be convicted in order to convict a principal under the statute.

*Venson*, 2019 WL 942310, at *6-7.

Under clearly established Supreme Court law, the standard governing sufficiency of the evidence claims is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under AEDPA, moreover, a habeas court's "review of a state-court conviction for sufficiency of the evidence is very limited," *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018), because *Jackson* claims are "subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). First, it is the responsibility of the jury to decide what conclusions should be drawn from the evidence admitted at trial. *Johnson*, 566 U.S. at 651 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). "And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence

challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Smith*, 565 U.S. at 2); *see also Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017) (stating that "two layers of deference apply [to a sufficiency-of-the-evidence claim], one to the jury verdict, and one to the state appellate court").

The Michigan Court of Appeals did not unreasonably decide this claim. As indicated by the state court, the particular section of the criminal sexual conduct statute at issue required as an element that Venson engaged in sexual penetration with the aid of another person while Venson had reason to know that the victim was helpless. MICH. COMP. LAWS § 750.520b(1)(d)(i). Venson asserts that because his co-defendant was acquitted, it necessarily followed that the jury did not find beyond a reasonable doubt that he was aided by another person.

The argument is unsound. It does not follow from co-defendant's acquittal that the jury found Venson acted alone or was not aided by another person. It is entirely consistent with the verdicts and the evidence that the jury was convinced beyond a reasonable doubt of Venson's identity as one of the perpetrators, and of the fact that a second person aided Venson on the crime, but at the same time the jury harbored a reasonable doubt as to the identity of the second perpetrator.

Michigan law holds that the particular identity of the other individual is not an element of this section of the criminal sexual conduct statute. *See People v. Vaughn*, 465 N.W.2d 365, 369 (Mich. App. 1990). And with respect to this element the jury was instructed, "that before or during the alleged sexual act the defendant was assisted *by another person* who either did something or gave encouragement to assist the commission of the crimes." (ECF No. 9-11, PageID.1120) (emphasis added). The jury was not instructed that in order for the element to be satisfied, it must specifically find that co-defendant was in fact the person who aided Venson. And the Court notes that the quantum of proof differed between Venson and his co-defendant: Venson's identity was established through DNA evidence whereas no DNA evidence was presented with respect to his co-defendant.

Moreover, even if it were the case that the jury both acquitted co-defendant and yet also found beyond a reasonable doubt that co-defendant was the person who aided Venson, such a situation would only indicate that the jury rendered logically inconsistent verdicts. Clearly established Supreme Court law, however, holds that "inconsistent verdicts are constitutionally tolerable." *Dowling v. United States*, 493 U.S. 342, 353-54 (1990). "Inconsistency in a verdict is not a sufficient reason for setting it aside." *Harris v. Rivera*, 454 U.S. 339, 345 (1981). The fact that an inconsistent verdict might be the result of lenity on the

part of the factfinder, coupled with the fact that the prosecutor is unable to obtain appellate review of a conviction, "suggests that inconsistent verdicts should not be reviewable." *United States v. Powell*, 469 U.S. 57, 65 (1984).

Finally, to the extent Venson argues that the evidence of his guilt is otherwise constitutionally insufficient, the argument is without merit. The victim testified to all the necessary elements of the offense. She described being drugged by a laced marijuana cigarette and thereby being rendered physically helpless. She described how two men assisted each other by moving her body to a couch to engage in acts of sexual penetration. Venson's identity as one of the two men who raped the victim was proven beyond a reasonable doubt by the DNA evidence. Venson's attack on the credibility of the victim's testimony does not speak to the constitutional sufficiency of the evidence. A federal habeas court may not re-weigh the evidence or re-determine the credibility of the witnesses. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983); *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003).

With respect to counsel's failure to move for a directed verdict of acquittal on this basis, the failure to raise a meritless claim does not constitute ineffective assistance of counsel. *See Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim.").

Venson's second and third claims are therefore without merit.

## C. Pre-Indictment Delay and Destruction of Evidence

Venson's final claim asserts that the delay between the offense and the prosecution rendered his trial fundamentally unfair. He asserts that the delay resulted in the loss of the victim's emergency room records, which may have included a toxicology report relevant to the victim's testimony that she was rendered physically helpless by drugs given to her by the perpetrators. The Michigan Court of Appeals rejected the claim on the merits, essentially finding that Venson failed to demonstrate prejudice. *Venson*, 2019 WL 942310, at *4-5.

The Due Process Clause provides a limited role in protecting criminal defendants against pre-arrest or pre-indictment delay. *United States v. Lovasco*, 431 U.S. 783, 789 (1977). Proof of prejudice is generally a necessary but not sufficient element of a due process claim involving pre-indictment delay, and the due process inquiry must consider the reasons for the delay as well as prejudice to the accused. *Id.* at 790.

The Sixth Circuit has consistently read *Lovasco* to hold that dismissal for pre-indictment delay is warranted only when the defendant shows: (1) substantial prejudice to his or her right to a fair trial; and (2) that the delay was an intentional device by the government to gain a tactical advantage. *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992). Where the pre-indictment delay is caused merely by negligence on

the part of prosecutors or police, no due process violation exists. *United States v. Rogers*, 118 F.3d 466, 476 (6th Cir. 1997) (rejecting the argument that "reckless or negligent disregard of a potentially prejudicial circumstance violates the Fifth Amendment guarantee of due process"); *United States v. Banks*, 27 F. App'x. 354, 357 (6th Cir. 2001) ("Our Circuit has recognized that where delay is due to simple negligence and not a concerted effort by the government to gain an advantage, no due process violation exists."). Where a habeas petitioner fails to show that the prosecutor delayed the prosecution for illegitimate reasons, it is unnecessary for a court to determine whether the petitioner satisfies the "substantial prejudice" requirement. *Wolfe v. Bock*, 253 F. App'x. 526, 532 (6th Cir. 2007) (no due process deprivation of right to fair trial when petitioner failed to establish that 15-year delay between murder and his arrest was for illegitimate reasons); *United States v. Schaffer*, 586 F.3d 414, 425-26 (6th Cir. 2009).

There is no indication in the record that the police or prosecutor intentionally delayed charging Venson as part of a tactic designed to make it more difficult for him to mount a defense. The incident occurred in July of 2004, and Venson was not arrested until August of 2016. The bulk of the delay was the result of the unconscionable mishandling by the police of approximately ten-thousand rape kits. (ECF No. 9-8, PageID.531.) The kits were outsourced for analysis, and Venson's DNA

was matched to the victim's rape kit in 2011. (*Id.*, PageID.541, 544). Venson was not arrested for another five years, but according to the state court, that was the result of "law enforcement's reasonable decision to prioritize investigation of serial sex offenders over the investigation of single offenders," given the volume of cases arising out of the cache of untested rape kits. *Venson*, 2019 WL 942310, at *5. The record therefore reflects that the delay was caused by the negligent handling rape kits and then by the prioritization of cases involving serial rapists – neither of which involved an intentional device by the government to gain a tactical advantage in Venson's case. Venson's pre-indictment delay claim is therefore without merit.

Venson relatedly asserts that the police knew or should have known that the hospital would destroy the victim's medical records after expiration of the 11-year record retention period, yet they made no effort to secure the records prior to their destruction.

The failure of police to preserve evidence that is only potentially useful for a defendant is not a denial of due process of law unless the defendant can show bad faith on the part of police. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). When the state fails to preserve evidentiary material "'of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant,' a defendant must show: (1) that the government acted in

bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means." *Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002). A habeas petitioner has the burden of establishing that the police acted in bad faith in failing to preserve potentially exculpatory evidence. *See Malcum v. Burt*, 276 F. Supp. 2d 664, 683 (E.D. Mich. 2003). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56, n.

Here, Venson fails to demonstrate that the government acted in bad faith in failing to preserve the evidence. Moreover, it is far from apparent that the hospital records had any exculpatory value. It is not known whether toxicology tests were performed or, if so, what they showed. And there is no indication that police were aware of any such tests or their results. Without such awareness it difficult to infer a bad-faith motive for failing to secure records prior to their destruction. The mere fact that the police may have been negligent or grossly negligent in allowing the medical records to be destroyed by itself is insufficient to show that the police acted in bad faith. *Monzo*, 281 F.3d at 580. The claim is without merit.

## CONCLUSION

As all of Venson's claims are without merit, the Court **DENIES** the petition for a writ of habeas corpus.

Furthermore, because reasonable jurists would not debate this result, the Court **DENIES** a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2). Finally, because any appeal would be frivolous, leave to appeal in forma pauperis is **DENIED**. See 28 U.S.C. § 1915(a)(3).

**IT IS SO ORDERED.**

Dated: June 30, 2021          s/Terrence G. Berg
                             TERRENCE G. BERG
                             UNITED STATES DISTRICT JUDGE